May it please the Court, I'm Keith Scully of Newman Dewars on behalf of Appellant Carl Knight. Mr. Knight is present in the courtroom with me today, and what we're asking this Court to do is reverse the District Court's dismissal at summary judgment of Mr. Knight's claims of disparate treatment, hostile work environment, and retaliation. Mr. Knight worked for 19 years for a promotion to security sergeant in King County's Facilities Management Division, and immediately after his promotion, a co-worker who was shortly to become the supervisor said that it was inappropriate for a black man to be promoted over a white man, and because of that, everyone was going to quit. It was not the first comment that particular individual had made. When King County changed its name from King County to Martin Luther King Jr. County, that individual was upset in front of Knight with King County's decision to make the name change. You talked about that comment, but it's my understanding from reading the record that Mr. Knight did not hear Mr. Bullard make that statement, that he learned of it after the fact. And just in the context of the claim here, which I think is the hostile work environment, doesn't it require that the conduct in question be so pervasive as to alter the conditions of the plaintiff's employment? And if so, and I think that's the standard, can you please address that? If this truly is a single comment that Mr. Knight never heard, how does it meet what seems to be a very high standard? That is the standard. I disagree that it's a high standard, certainly at summary judgment. Plaintiffs need to produce minimal evidence of a hostile work environment in order for a jury to consider it. And the error the district court made is considering that comment outside of the entire course of interaction between the two men. That is the standard. It's whether the environment was so severe that it altered the terms and conditions of the plaintiff's employment. The nature of the workplace is that when you say something outrageous, word is going to get around. It should not have been a surprise, and it probably wasn't a surprise to Willard that Knight heard about the comment. Now, was that comment alone enough to make a hostile work environment? I don't know, because the comment wasn't alone. What happened after the comment is that Willard was given supervisory authority over Knight and proceeded to do a series of things to take away Knight's authorities as sergeant. In other words, to implement his beliefs. He thought it was inappropriate for Knight to be promoted. He then proceeded to do what he could to remove the duties of the sergeant from Knight. Which means that every day Knight showed up to work and something bad happened, he knew that it wasn't just because Willard disliked him. He knew that it wasn't just some odd workplace dynamic. He knew that Willard was taking responsibilities away from him because he was black. And that's what made a hostile work environment. The adverse actions that were taken with the knowledge that it was done because of racism. This court recently reaffirmed that a plaintiff need produced very little evidence in a question of employment discrimination. And the discussion we just had is why. Because these cases are incredibly fact intensive. A jury needs to decide not only what happened, not only who said what to whom, but why it was said and what impact it had on the person who heard it or was affected by it in the context of the particular workplace that it took place. In Davis v. Team Electric, he noted that these cases are most appropriately resolved by a fact finder upon a full record. In order to prove the elements of disparate treatment, Knight proceeded under the McDonnell-Douglas burden shifting framework, which of course required four prima facie elements. That he's a member of a protected class, not a challenge there. That he was qualified for his position. And he was the highest scorer on an objective examination for the position of security sergeant. That he suffered adverse employment actions. And we disagree with some of the district court's findings regarding adverse employment action, but the district court did find in our favor that some of the conduct Mr. Knight complained of qualified as an adverse employment action. The district court dismissed the case on a finding that Mr. Knight did not meet the fourth element. Fourth element has two possible methods. One, Mr. Knight can produce evidence that there were similarly situated persons outside of his protected class who were treated better. Or, Mr. Knight can produce other circumstances surrounding the adverse action that give rise to an inference of discrimination. Taking those two in reverse order, the district court didn't look at Willard's comment. Willard's what? Willard's comment. The comment that it was inappropriate for a black man to be promoted over a white man. That is an other factor circumstance that gives rise to an inference of discrimination. It's not an inference. He told us why he was doing it. So from that, every adverse employment action that can be traced to Willard, we know is based upon Knight's race. That meets all elements, and Knight should have been allowed to proceed to a jury on that alternate basis alone. Secondarily, Willard was similarly situated to Knight. There's really no question that Willard had more advantages in his sergeant's position. The district court found, well, he was senior, and seniority is sufficient to distinguish him from the junior sergeant, Knight. But Willard's seniority only got him two things. King County cites to a case from a different circuit, which provides that seniority can be a distinguishing factor, but there's a but to it. Seniority can be a distinguishing factor, but only if there is some collective bargaining agreement or other basis establishing that seniority gets you extra privileges. In this case, seniority got Willard two things. He got first choice of shift, which we do not challenge, and he was assigned to supervise Knight during the initial period of Knight's training. We don't challenge that action either. What we do challenge is that when you take a look at the job description for security sergeant, Willard got to do every last step of it. Knight only got to do certain sections of it, based upon Willard's decisions and the decisions of Knight and Willard's supervisors. The hostile work environment claim relates to either verbal or physical conduct of a racial nature. There's no question that there was verbal or physical conduct of a racial nature, and as we discussed, the question is, was it enough? And I would submit that a jury is the appropriate fact finder to determine whether when you show up to work every day as a security sergeant, knowing that you're not allowed to do scheduling, at least in part because of your race, that is sufficient evidence for a jury to consider whether the environment was objectively hostile enough for Knight to have suffered from it. We also ask that a jury be allowed to consider whether Knight was retaliated against. That is based on an entirely separate set of facts with separate actors. Knight was not quiet about his difficulties with Willard. He complained repeatedly to his supervisors before his promotion and after his promotion. He filed a complaint with his union, and he ultimately filed a grievance with the EEOC. In order to establish that unlawful retaliation was a factor, and this court's cases emphasize that it need only be a factor, it is perfectly possible for Knight to have proceeded to a jury if there were both proper and improper reasons for King County's discipline. All he has to establish is that improper reasons were a factor. Knight can either prove that unlawful discrimination more likely motivated the employer, or he can show that the proffered explanation for the discipline was simply unworthy of credence, that it's not a believable reason for the discipline that was imposed. In this case, King County argues that he was first threatened with termination and then suspended and demoted, not because he filed a complaint with his union, but instead because he walked into the data unit at King County and asked questions about a warrant. What did he do? Well, Mr. Knight gets the factual inference and all facts assumed in his favor. The evidence of summary judgment is that a friend of his at a bonding company asked him to check into whether a particular felon was misrepresenting his name and therefore due to be released on one warrant, even though there was a separate, much more significant warrant that meant the felon should remain in custody and be transported to Washington. So Knight walked into the data unit and asked if that was true. The data unit sent him to the fingerprint unit for a comparison. Knight walked over there, explained why he was there, that he was not there as part of his official duties, and asked if a fingerprint comparison could be done. The fingerprint unit initially did it and then told him if he wants an official report, he has to go through official channels, at which point he was told, that's not something we can do. That's not something a bonding company is entitled to get. That's the story. That's what warranted first termination and then suspension and demotion. The jury should have considered two factors in deciding whether it's sufficient to prove that retaliation was a factor or whether that story is the sole basis for Knight's discipline. One, proximity and time. The defendants admitted that they convened meetings with the same people at the same time discussing two things. One, Knight's protected speech complaint. Two, whether he should be disciplined for asking about the fingerprints in the warrants. Proximity and time alone is enough to go to a jury. This is not close proximity. This is simultaneous. The exact same meeting with the exact same people discussing both the improper factor and whether there was a proper factor. Second, the sheer unbelievability of that discipline. The best King County could do in supplying a similar disciplinary circumstance was someone who is terminated for failing to disclose a financial interest in the transaction. That simply didn't happen here. If Knight committed misconduct, it is the type of misconduct that is met by a don't do that again or at worst a written reprimand or some other lesser form of discipline. In conclusion, King County has done an adequate job of establishing disputes of fact that a jury will have to sort out. Their briefing is rife with alternative explanations of what might have happened. It will be an interesting argument to the jury as to whose version of events is correct and whether Knight's theory that he was significantly impacted by the conduct is enough to meet the elements of hostile work environment and disparate impact. But at summary judgment, Knight gets the inferences and simply saying we disagree with him or we have contradictory evidence does not get the county out of a jury trial. Thank you. Thank you. Good morning. May it please the court. My name is Mark Stockdale. I'm here representing King County, Kathy Brown, Amir Fakir, Dan Knoyer, and Dave Stamper. I'm also joined by Mr. Tim Gosselin who represents Gene Willard. I would like to use approximately 11-12 minutes of my time and I'll be mindful of the clock and defer the rest of the time to Mr. Gosselin who will address the court about Mr. Willard. Thank you. I would also point out that Kathy Brown and Amir Fakir join me today. I'd like to discuss three points. One is the retaliation claim. I'd also like to point out that the record does not support many of the contentions about disparate treatment that Mr. Knight has brought forward. Ultimately, I hope to point out that Mr. Knight was not treated less favorably either in retaliation or in disparate treatment discrimination than other similarly situated persons. Let me start, if I may, with retaliation. Carl Anderson was an employee under Kathy Brown. He failed to disclose a financial interest in the transaction. That transaction had absolutely no, didn't cause any financial or monetary injury to King County. Nevertheless, he violated the Ethics Code and he was fired for it because of that possible financial interest. Carl Knight, in contrast, also violated the King County Ethics Code. He did not, according to Mr. Knight, have a financial interest in or wasn't paid to help the bail bond company and he was demoted. Same discipline, ultimately, that Gene Willard got for making the sad day comment. Carl Knight went into the AFIS and data units of the King County Sheriff's Office. He used his position to go into the AFIS unit to try to get the extradition limits on a fugitive warrant changed. He inquired of people and, frankly, he fooled people there. They thought he was there on official business. Over time, they realized, no, he's there on behalf of the bail bond company and this is inappropriate. King County reasonably concluded that Mr. Knight's efforts violated the Ethics Code and, according to the Villaremo case, that good faith, honest belief is sufficient. It's not a pretext to think that he was doing something else. In terms of temporal proximity, the cases relied upon by Mr. Knight are what I call proximity plus pretext cases. They demonstrate some proximity in time, but the underlying analysis shows pretext. Those are cases like the Davis case, the Strother case, Hyannis Eyre case. That's not the situation here. At the moment that Carl Knight went into the AFIS and data units, I think context is important. He'd been promoted to sergeant. He'd recently passed probation. The person who brought the complaint about Carl Knight was Kathy Pompeo, the very person who wrote the letter of recommendation supporting Carl Knight's promotion. The investigator, Patricia Eakes, an outside attorney independent of the county, was an investigator who had actually investigated Carl Knight's complaints about a subordinate officer named Audra Wilson, Ms. Wilson who was sexually harassing Mr. Knight. And Ms. Eakes concluded that, yes, indeed, there was evidence that Mr. Knight had been harassed. At the moment that the county investigated Mr. Knight's misconduct, there was absolutely no reason to believe that they were, quote, out to get him. Really what pretext means is, are there reasons to be suspicious of the employer's reasons? Are there reasons to believe they're false? In this fact scenario, there was absolutely no reason to believe that anyone was out to get Carl Knight. Carl Knight violated what he himself testified to be the number one duty of a security sergeant. I asked him during deposition, I said, Mr. Knight, what do these notes mean? What does this document mean? And he said, well, duty number one is to exercise discretion and judgment. That's what Carl Knight failed at. And he was treated commensurately. In terms of Mr. Knight's disparate treatment claims, they are very wide-ranging. And the challenge has really been to kind of break them out both individually and to look at them in a larger context. The record does not support Mr. Knight's claims. And let me give some examples. He claims that he was, his decisions were countermanded, I think is the term he used. I draw the court's attention to excerpts of record, pages 101 to 104, where Mr. Knight is talking about log sheets. And he's complaining that Gene Willard took away or countermanded some direction. I can't emphasize enough how important it is to carefully read the record. I've had to reread it many times. And what becomes clear is that Mr. Knight was actually complaining about one of Mr. Willard's officers on the first shift. Mr. Knight is a graveyard shift sergeant. And he brought to Mr. Willard's attention the fact that, hey, one of your officers is putting together a very poor log sheet. This was not Gene Willard complaining about someone under Mr. Knight's command. And what Mr. Willard does is say, you're right, Carl. That is a poorly done log sheet. And Gene Willard proceeds to tell the officer, do a better job next time. Similarly, this is at Excerpt from Record 304. There's an event about Officer Lonnie Hampton. Carl Knight wrote up Mr. or Officer Hampton and said, you improperly used a security camera to hone in on female patrons of the courthouse. And he put the note in Officer Hampton's box. And Officer Hampton was quite angry to be accused of this. An investigation was conducted. And there was no evidence that Officer Hampton had misused the camera. And the investigation was very simple. All he had to do was look at the electronic log that's created in the event that the camera is adjusted. Officer Knight was not reprimanded. Officer Knight was simply told, you know, sergeants don't have the authority to discipline. They can make a recommendation, but you've got to follow your chain of command. Carl Knight was instructed, again, counseled. He was a new sergeant. But these events illustrate that Mr. Knight is unwilling to be instructed or counseled by a supervisor. In this event, it would have been Dan Knoyer. Similar time sheet. Officer Ted Griffin complained to Gene Willard. You know what, Mr. Knight, Sergeant Knight is not properly filling out my time sheets. I'm going on vacation. I haven't been paid. Gene Willard gives him $200 out of his own pocket and says, okay, pay me back when you get back from vacation, when you get paid yourself. These points, and again, Sergeant Knight at the time was not counseled, was not reprimanded. Nothing was done to affect the status of his position at that time regarding these events. He talks about exclusion from special assignments. The ironies in this case are really fairly visual because the one special assignment he complained about was, quote, Dan Knoyer's protege being allowed to do the electrical work. Dan Knoyer's protege was an African-American electrician by the name of Mark Murphy, who had the expertise to perform the task. In none of these events is Carl Knight being treated disparately on account of his race. There were common sense, reasonable, rational, legitimate reasons for taking certain actions, and they did not affect the terms or conditions of his employment. Another example are the noon meetings. Historically, they were held at the supervisor meetings where at noon. I am sure that was a burden for Mr. Knight. I am sure that because he worked the graveyard shift, it was onerous. But Mr. Knight, the court should be well aware, took it upon himself to manage the own burdens of his schedule, and he worked an extraordinary amount of overtime. In fact, in 2008 alone, if you look at the declaration of Judy Harrison, in 2008 alone, he worked the equivalent of 60 extra days of work. Now, he may have taken it as a shift. I just took the numbers and divided them by 8, which is the standard work day. Sixty extra days. So clearly, Mr. Knight was willing to manage the burdens of the graveyard shift. He just simply wanted to be compensated. And what permits the county's decision-making is limitations on overtime and entitlement to overtime via the collective bargain agreement drove decision-making. A mandatory four-hour payment. That meant you're not going to call somebody at home and have a five-minute conversation about a bomb scare because you're going to have to pay them four hours. The noon meetings, the county willingly paid Mr. Knight overtime to attend. They knew it was a burden, and he attended. Similarly, yeah, the county had to curtail overtime, curtail it for everybody. The county during this period, 2008-2009, was in a major budget crisis. I just want to point out that much is made about the sad day comment made by June Willard, and it truly is an offensive comment. But unlike the cases, such as Davis, where offensive comments were commensurate in time with adverse acts, that didn't happen here with June Willard. As much as Mr. Knight wants to portray it that way, there's actually no evidence that June Willard treated Carl Knight adversely during Carl Knight's period of probation. It's very important to understand that in King County, the one status, the one condition of employment to be achieved is what's called career service status. You move from a probationary employee to a terminable-for-cause employee. In other words, you have appeal rights. You can't be disciplined. You're no longer at will. That is the major purpose of probation in the county as well as in many municipalities in the nation. June Willard was assigned to train Carl Knight during that period of time, and Carl Knight was successful. And if you look at the two-month, the four-month, and the six-month evaluations, they're very positive. June Willard had input. Dan Knoyer had input. Dave Stamper had input. They treated him very, very favorably, and Mr. Knight, to his credit, earned it. A couple of comments about the hostile work environment claim. I wasn't going to address it, but I was surprised to hear the comment today because the Sad Day comment wasn't disclosed to Mr. Knight for almost a year. And after that, Mr. Knight didn't disclose it for two or three months, as I recall. There was no gossip in the workplace. There were no rumors about June Willard. It was quite a surprise. And it came out, I believe it was March of 2009. It came out after all the investigations had been commenced. Further, as Mr. Knight admitted, there were no slurs in the workplace, no taunts, really no race-based comments of any other than the Sad Day comment. The workforce is quite good. Mr. Stockdale, I'm just wondering, are they both still working for King County? Willard and Mr. Knight? Mr. Willard is not, no. Just let me be clear. Mr. Knight works. Mr. Willard chose to resign in lieu of the demotion and suspension. Thank you. Yeah. I think it's also important to realize that the requirement, the element of adverse action really separates the petty, the everyday, the irritable, the irksome decisions that are made by a supervisor or an employer and the employee from the actionable. That is an important element. And Carl Knight has not established that any of the alleged acts by the county affected the terms and conditions of his employment. I'm particularly concerned. I asked this court to affirm the district court, but I strongly disagreed with the district court in one respect. The district court said that casual water-cooler types of conversations could be adverse acts. That is a standard that goes so far above any other case I've read and is entirely unmanageable from an employer's perspective. I think of all the times I'm walking down the hallway and I run into a colleague and sort of like a gestalt, yeah, we could do it this way. I don't believe that the judge meant that that would suddenly be an adverse act, especially given that in the record before the court, there was absolutely no mention of what decisions or discussions were actually had. So whether it be based on the record is lacking or because they simply aren't adverse acts, it doesn't matter, but I don't want that point to stand. I appreciate the court. I'd be happy to answer any questions. Mr. Gosselin represents Gene Willard, and I would like to defer the rest of my time to him if I may. That's about 30 seconds. I'm cutting it close. Yeah, okay. Thank you. I'll be brief. The only claim that was dismissed against Gene Willard was the hostile work environment claim. That's the only one that is here. The trial court in its order identified several grounds for dismissing that, recognizing that it didn't meet the standard that's set forth in the Vasquez v. City of Los Angeles case involving looking at all of the factors. I just have one question regarding Mr. Willard. I guess why isn't he similarly situated to Mr. Nye, given I think that seniority in the context that they were working under is used to Well, first off, I'd point out that the job description identifies that the responsibilities for a particular individual may vary. It says that directly in the job description. I think it's set forth at the excerpts of Record 102. Seniority is a legitimate basis to distinguish between some responsibilities, but the reality is I don't think that they were different in any particular respect, as was Mr. Nye, Sergeant Nye. The two individuals worked different shifts. They carried generally the same responsibilities, and the only difference was with the master scheduling, and actually that was simply an administrative function of putting a pre-selected individual into a slot. So I guess I don't disagree that they are similarly situated. I don't think that that affects the hostile work environment claim. Mr. Willard was not a supervisor over Mr. Nye, and the only time that they were in an even arguably supervisory position was during the brief period when Mr. Willard was assigned to train Mr. Nye, and that was during the six-month probationary period. And the point that I'd make about that is that under Willard's training, Nye got positive performance reviews, was transferred from probationary status to permanent status. With regard to the other factors that the court should consider on hostile work environment, I'd only point out that Nye didn't report any misconduct about Willard to anyone. Look at Mr. Nye's grievance that he filed, and that's at Excerpts of Record 512. He filed a grievance in October. He didn't even name Mr. Nye. The sad day statement, he wasn't aware of it for over a year after it occurred. In the EEOC complaint that Mr. Nye filed, the only allegation against Mr. Willard is the sad day comment. It's factors such as those that show that any conduct by Mr. Willard was not severe, was not pervasive enough to support a hostile work environment. Thank you. Thank you. Thank you. I disagree with Mr. Gosselin's characterization of the procedural posture of the case. The district court dismissed all of the disparate treatment allegations against Sergeant Willard except for one, which related to timesheets, and we subsequently settled that one adverse employment action. So what we've appealed is all the other stuff, all the other adverse employment actions that the district court dismissed. The timesheets are no longer on the table. Regarding Mr. Stockdale's comments about the importance of the things that were taken away from Nye, what Nye noticed before he was promoted is that there was kind of an inner circle of people who made the decisions within the Facilities Management Division. He assumed when he got promoted to sergeant that he would be included in that. He wanted to be chief. He wanted to be part of the management. He wanted to have an impact on his workplace. If you take a look at the job description for both sergeant and officer, both of which are in the record, and you go down the list of differences, they are not great. Sergeants did not have a huge amount of extra responsibility. And if you go down the same list and look at what Nye was allowed to do, you'll find that the fairly minimal differences, for the most part, did not apply to him. So he didn't get special projects. The county's attitude appears to be, so what? We gave them to an electrician, or we gave them to Martin, who was an officer we just let stand in because he wanted to. But participating in special projects is one of the few differences between a sergeant and an officer. At the end of the day, little was left of the sergeant's position for Nye. And what he ended up doing was still being an officer, despite the fact that he was allowed to wear stripes. The water cooler acts comment, that related to the informal meetings that Willard admitted he had with the senior managers. And the district court's holding is correct. In some circumstances, if you are conducting your business around the water cooler, rather than an official meeting, that can be an adverse employment action. What circumstances? Well, this one, because Nye worked at night. He wasn't there for the water cooler meetings. So we're not arguing that the exclusion from them is a problem. We're arguing that when you've got people working on different shifts, you conduct your business in the official meetings that everyone can attend. You don't make your management decisions while getting a cup of coffee with the people who just happen to be there, who just happen to be the inner circle you've always worked with. You have to make room for the night shift when you create it. Regarding the retaliation, Mr. Stockdale made a comment that there was no evidence that Nye was out to get the senior managers, Mr. Fekir and so forth, who made the decision. But Nye had just filed a union complaint, and he directly named Fekir and the other managers and accused them of all kinds of things related to the deprivation of the sergeant's duties and related to his belief that he was being excluded from the job he should be able to do. That's what motivated Fekir to get rid of him and the others to get rid of him. He was making waves and he was causing problems. They then had meetings about those complaints and about what he did and terminated him. The violation that he was accused of committing was the King County Ethics Code. It was misuse of county facilities, and had a lengthy conversation with Kathy Brown that's in the record relating to the parameters of that for security sergeants. It was okay for them to make short phone calls. It was okay for them to use county paper and pencils. It was not okay for them to conduct their own business on a county computer rather than doing their job. This misconduct, if it is misconduct, in our view falls far closer to using the telephone to make a personal call to your dry cleaner or a personal call to wherever else than it does to running a business on a county computer. The alleged misconduct took place over a few minutes or a few seconds. It did not disturb men's duties, and it's our position that a jury has to decide whether that slight misconduct warranted the severe sanctions that Knight faced. Thank you. Thank you. Thank you. Thank you. Very much. The case is now submitted.
judges: Kobayashi, Silverman, Murguia